People v Wally (2026 NY Slip Op 50219(U))

[*1]

People v Wally

2026 NY Slip Op 50219(U)

Decided on February 19, 2026

Criminal Court Of The City Of New York, Bronx County

Sorrentino, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 19, 2026
Criminal Court of the City of New York, Bronx County

The People of the State of New York,

againstHigee L. Mercer Wally, Respondent/Defendant.

Docket No. CR-021491-25BX

For the Respondent:Michael Ruben 
The Legal Aid SocietyFor the Petitioner:Justin ThompsonNew York City Counsel, ASPCA

Joseph M. Sorrentino, J.

The respondent, Higee L. Mercer Wally, is charged with nine counts of failure to provide proper food and drink to certain impounded animals under New York State Agriculture and Markets Law ("AML") § 356. The petitioner, the Animal Society for the Prevention of Cruelty to Animals ("ASPCA"), filed a petition seeking payment for all reasonable expenses incurred in the care and boarding of the respondent's dogs, which had been seized upon the respondent's arrest, under AML § 373.
On October 1, 2025, October 27, 2025, and November 20, 2025, this Court held an evidentiary hearing to determine whether the petition should be granted. At issue before the Court is (1) whether the animals were properly seized; (2) whether the ASPCA established by a preponderance of the evidence that the respondent violated a provision of Article 26 of the AML; and (3) whether the amount requested by the petitioner is reasonable.
Upon consideration of the testimony and evidence presented during the hearing, the oral arguments by the parties, and relevant legal authority, the petition is GRANTED to the extent that a security bond is granted in the amount of $40,444. The Court orders the respondent to post security in the amount of $40,444 within five (5) days of the issuance of this decision and order to secure payment for all reasonable expenses incurred in providing for the seized animals. The Court also orders that if the bond is not posted within five (5) days of the issuance of this decision and order, this may result in the immediate forfeiture of the animals to the ASPCA for disposition pursuant to the relevant provisions in the AML.
 RELEVANT PROCEDURAL BACKGROUNDOn August 4, 2025, at approximately 1:20 AM, the NYPD seized nine dogs from inside of 2373 Prospect Avenue, Apartment 10, in the Bronx, at the time of the respondent's arrest. The [*2]respondent was arraigned on August 5, 2025, and released on his own recognizance.
On September 8, 2025, the ASPCA filed a petition pursuant to AML § 373(6)(a) seeking an order for the respondent to post a security for the reasonable costs of care for the nine original dogs seized and seven newborn puppies, born to one of the original dogs following the seizure, in the amount of $47,428.34. The Court ordered an evidentiary hearing under AML § 373(6)(1) on the ASPCA's petition.
The evidentiary hearing was held on October 1, 2025, October 27, 2025, and November 20, 2025. During the hearing, the ASPCA called two witnesses: Police Officer Joseph Mercedes of the 48th Precinct and Dr. Laura Niestat, a forensic veterinarian employed by the ASPCA. The respondent planned to testify himself, however, he did not appear on multiple dates, and the hearing concluded without his presence. A bench warrant was ordered for his return to Court on November 21, 2025. Since then, the respondent has not returned to Court. Ultimately, the respondent called no witnesses.

 FINDINGS OF FACT
The Court finds the testimony of both witnesses credible and makes the following findings of fact.
On August 4, 2025, Officer Mercedes arrived at 2373 Prospect Avenue, Apartment 10, in the Bronx in response to a 311 report submitted to the online 311 website application. The 311 report, complaining about noise from barking animals, had a video attached to it, which was admitted into evidence as Petitioner's Exhibit 1. It depicted an individual Officer Mercedes identified as the respondent carrying a dog down the stairs by the base of the head or by the top of the neck. The dog's legs were freely swinging. At one point, the individual and the dog moved out of frame, but a thud could be heard followed by a dog whimper. Another part of the video depicted the same dog and individual, wherein the individual was shown running towards the dog and then appearing to strike the dog. The individual yelled at the dog, carried the dog down the stairs by the neck, and then slammed the dog to the floor, resulting in high-pitched vocalizations from the dog. The video itself was timestamped in February 2025, and Officer Mercedes stated that the complainant informed him that the time stamp was accurate. After viewing the video, Officer Mercedes proceeded to the respondent's residence at 2373 Prospect Avenue, Apartment 10, in the Bronx.
Previously, Officer Mercedes gained familiarity with the respondent after responding to several 311 complaints against the respondent with regard to noise complaints concerning animals barking in the apartment in the past six months preceding August 4, 2025. None of these previous complaints resulted in any arrests.
Upon Officer Mercedes' arrival to the residence with his partner, the respondent opened the door. The officers told him that they arrived due to a 311 call. They informed the respondent that they would be calling their sergeant, who then arrived about five to ten minutes later. The respondent stood for many minutes with the officers in the hallway. At this time, Officer Mercedes was unaware of anyone else in the apartment and could not see inside the apartment, although the door was slightly ajar. However, Officer Mercedes could hear noises in the apartment, such as barking and one dog scratching at the door. Officer Mercedes could not smell anything from the apartment as he stood in the hallway. When his sergeant arrived, the sergeant stated, "92," meaning that he was ordering the officers to arrest the respondent. The respondent [*3]was then placed in handcuffs. The sergeant then informed the respondent about the 311 video, and the respondent stated, "I would never hurt my puppies, they are my babies." The respondent was then taken away.
Officer Mercedes then entered the apartment, under the belief that there may have been animals that needed care and medical attention. No warrant was obtained before the officers entered the apartment. Officer Mercedes had no knowledge of how long the respondent would be away for, and had reason to believe the dogs would not be under anyone's care. He believed the dogs needed care based upon the 311 video. After entering the apartment, Officer Mercedes observed dog feces in the bathroom, smelled a pungent odor emanating from the feces, and then saw a couch with exposed coils in the living room where some of the dogs were hiding. Visually, nothing that Officer Mercedes observed gave him concern that the dogs had injuries or needed care until one of the dogs got his foot stuck on one of the coils of the couch. He also observed that some of the dogs had matted coats. The petitioner admitted into evidence Petitioner's Exhibit 2 which were four photographs taken during and after the arrest. The photographs depicted the state of the respondent's apartment consistent with Officer Mercedes' testimony. In addition to his previous testimony, one of the photographs showed an individual in the background, who Officer Mercedes' identified as the respondent's brother. Another photograph showed what appeared to be a bowl for food or water, and Officer Mercedes stated he observed food in the apartment, but that the dogs did not have access to the food. According to Officer Mercedes, the fourth photograph depicted the dog he saw in the 311 video. The dog appeared healthy.
All nine dogs in the apartment were subsequently seized and brought to an animal care facility in Manhattan with the use of crates and leashes as the dogs did not willingly leave.
Dr. Laura Niestat testified that she worked at the ASPCA as a forensic veterinarian, meaning that she performed medical evaluations on animals that were the subject of animal cruelty evaluations. She attended veterinary school at Tufts University for four years and was licensed to practice veterinary medicine in New York State. After her graduation from veterinary school, she completed a one-year internship in general medicine and surgery, and she stayed at that practice for some time in the role of an associate veterinarian. Later, she became the medical director of that practice. In 2006, she began working at the ASPCA for a year as the Assistant Medical Director of the hospital. Then, she moved to Boston and worked as an emergency clinician at a 24-hour emergency hospital for two years. In 2009, she returned to the ASPCA and worked as an associate veterinarian, and then in 2013, she began working with animal cruelty cases and achieved her current title in 2014. During her time with the ASPCA, she had been the lead veterinarian on over a thousand cases involving more than 2,000 animals and, working with three other veterinarians, has had well over 3,000 cases involving more than 6,000 animals. Thus, Dr. Niestat is qualified as an expert in veterinary science, which was also ruled on the record.
Dr. Niestat evaluated the seized nine dogs in this case on August 5, 2025, at the animal hospital located at 424 East 92nd Street in Manhattan. After the dogs' arrival to the hospital, they were given new identifying names all after different sea creatures and vegetation. Dr. Niestat was provided with three videos of the apartment and the four photographs taken at the apartment. Dr. Niestat stated that the videos depicted a group of dogs in the residence and two traumatic incidents between an individual and a dog. Petitioner's Exhibit 3 was then admitted into evidence, which was a thirteen-page document containing a copy of Dr. Niestat's veterinary [*4]statement for this case made around the time of the examination. She testified that one of the nine dogs gave birth on August 14, 2025, to seven puppies, who were all doing well. At the time of the hearing, the puppies were in a foster home with the mother.
Regarding the nine dogs, Dr. Niestat found that there were two adults and seven juveniles (meaning that they were under a year old) in the population. Overall, she found that they were an unhealthy population of dogs with abnormal examination findings and medical conditions that could be related to a poor environment or poor environmental conditions. In general, she found that many of the dogs had dirty, stained haircoats from urine and feces. Four dogs had pododermatitis, which is an inflammation of skin on the bottom of the feet from standing in moist environments. Two of the dogs had conjunctivitis (pink eye). She stated she could not determine how long the dogs had these conditions, although their dirty haircoats indicated to her that they may have had these conditions for a long period of time. Three of the dogs were underweight, and she ruled out underlying medical conditions that could have caused those dogs to be underweight. One of the other dogs had a gastrointestinal parasite and diarrhea. Five of the dogs were lean to ideal weight and one dog was thin to lean weight. None of the dogs were emaciated. One of the dogs was dehydrated, but this dog was pregnant, and Dr. Niestat testified that pregnant dogs required more water than other dogs. The other eight dogs were well hydrated.
Dr. Niestat took x-rays of all of the dogs. From the x-rays, she observed that three of the juvenile dogs had a fracture in their backbones. Based on the amount of healing observed on the x-rays, she determined that the injuries were about 10 days old, and they appeared to be the result of blunt-force trauma. She could not determine what specifically caused the injuries.
Dr. Niestat testified that she had observed the video, which had been admitted as Petitioner's Exhibit 1, at the time she examined the dogs. She stated that the dog in the video resembled a dog that they had monikered, "Shrimp," and it depicted improper handling of the dog. She stated that because of the many sensitive structures in the neck, all of the tissues in the neck were vulnerable to some type of injury when a dog is carried solely carried by the neck. However, the dog "Shrimp" was examined to have no injuries.
Dr. Niestat also reviewed Petitioner's Exhibit 2 and testified that the photographs depicted an unhealthy and unsanitary environment. She identified the couch with the exposed coils as a hazard. She stated that the pododermatitis and the conjunctivitis could have been caused by the environment captured in the photographs. She did state that the amount of feces depicted in the photograph of the bathroom could have been accumulated from one day with nine dogs.
The ASPCA had been providing care to the nine seized dogs since August 5, 2025, and care to the seven puppies since their birth on August 14, 2025. Expenses associated with that care came from the costs for medical care, hospitalizations, and boarding. Petitioner's Exhibit 4 was admitted into evidence, which included the invoices for each of the 16 dogs for their care. Dr. Niestat testified that the invoices contained some discrepancies where one of the dogs was overcharged by $20, and another dog was undercharged by $10. At the time of the hearing, some of the dogs were in foster care, and some of the dogs were held at the ASPCA in caged rooms.

CONCLUSIONS OF LAW
When there is a charge against an individual for a violation of a provision of Article 26 of the AML, the impounding organization, such as the ASPCA, may file a petition with the court for a security bond to cover costs that arose from the animals' care while in the impounding [*5]organization's custody under AML § 373(6)(a). Upon service of the petition, a hearing must be held within 10 business days (see AML § 373[6][b][1]). Under AML § 373(6), the petitioner has the burden to establish that (1) the animals were properly seized under one of the five mechanisms enumerated in AML § 373(1) — (5); (2) that the respondent has been arraigned for an offense contained in Article 26; (3) that by a preponderance of the evidence the respondent violated a provision of Article 26; and (4) that the security bond requested is reasonable and represents the costs incurred by the impounding organization in caring for the seized animals (see People v Scott, 59 Misc 3d 688 [Crim. Ct., Bronx 2018]).
The respondent does not dispute the second factor of the test, that he has been arraigned for an offense contained in Article 26 of the AML; as such, this is not at issue, and the petitioner has met this factor.
Whether the Dogs Were Properly Seized Under One of the Five Mechanisms Enumerated In AML § 373(1) — (5)The respondent argues that the petitioner did not establish that the nine dogs were properly seized under AML § 373 because the officers did not obtain a warrant, nor did a warrant exception apply. However, the petitioner argues that AML § 373(4) is applicable to the facts of this case, which does not contain a warrant requirement. In any event, the petitioner argues that the facts adduced at the hearing would still survive a Fourth Amendment analysis.
As noted, the petitioner has the burden of establishing that the dogs were properly seized under one of the provisions enumerated in AML § 373(1) — (5). Relevant here are AML § 373(2) and (4). AML § 373(2) allows a police officer to
lawfully take possession of any animal in or upon any premises other than a street, road or other public place, which for more than twelve successive hours has been confined or kept in a crowded or unhealthy condition or in unhealthful or unsanitary surroundings or not properly cared for or without necessary sustenance, food or drink, provided that a complaint stating just and reasonable grounds is made under oath or affirmation to any magistrate authorized to issue warrants in criminal cases, and that such warrant authorizing entry and search is issued and delivered by such magistrate; if just and reasonable cause is shown, the magistrate shall immediately issue such warrant.In People v Scott, the court found that AML § 373(2) applied because even though the officers did not obtain a warrant, the emergency doctrine exception to the warrant requirement applied (see Scott, 59 Misc 3d at 693-694). There, the respondent had not been at the apartment when other residents of the building called the NYPD to report a foul smell that they believed to be a dead body (id. at 690). Upon arriving at the residence, the officer could hear a dog inside the apartment, leading him to call the Emergency Service Unit to open the door (id. at 690-91). After the Emergency Service Unit entered the apartment, the stench was revealed to be animal waste, and no one was in the apartment except for a dog and a cat (id. at 691). The animals were subsequently seized (id.).
Unlike in Scott, here, the respondent was arrested and placed in handcuffs prior to the NYPD entering the apartment and seizing the nine dogs. Although the NYPD did not obtain a warrant pursuant to AML § 373(2), AML § 373(4) is instead applicable to this case.
AML § 373(4) provides, in relevant part, "[w]hen any person arrested is, at the time of such arrest, in charge of any animal any police officer may take charge of such animal." Here, it is undisputed that the respondent was arrested and at the time of the arrest was "in charge of" the nine dogs. The arrest took place immediately before the seizure of the dogs.
Unlike AML § 373(2), AML § 373(4) does not contain a warrant requirement. While AML § 373(2) specifically delineates that the police may lawfully seize an animal "provided that a complaint stating just and reasonable grounds is made under oath or affirmation to any magistrate authorized to issue warrants in criminal cases, and that such warrant authorizing entry and search is issued and delivered by such magistrate," AML § 373(4) contains no such language and is specific to when an individual is arrested and in charge of an animal.
Further, unlike AML § 373(2), AML § 373(4) is a seizure mechanism that is not confined to an arrest based on a violation of Article 26 of the AML. Pursuant to AML § 373(4), an individual could be arrested for anything, and if in charge of an animal, that animal may be seized, to ensure that the animal will not be stranded when their owner is taken into custody. AML § 373 was enacted by the Legislature "to prevent future abuse or the abandonment or stranding of such animal" (AML § 373, 2019 Practice Commentaries by Jed L. Painter).
What does slightly complicate this analysis is the fact that the respondent's brother was inside the residence at the time of the respondent's arrest. However, there is no testimony showing that the brother claimed any responsibility over the nine dogs. In addition, AML § 373(4) does not contain any language or exception that the individual arrested must be the only person "in charge of" the animal at the time of the arrest. AML § 373(4) also does not provide that the police are obligated to find someone related to the individual arrested to care for the animal. Further, when "the petitioner has shown that the animal has been seized under one of the provisions enumerated in AML § 373(1) — (5), questions about the legality of other police conduct is best litigated in the underlying criminal proceeding" (see People v Ortiz, 2019BX029353, 2019BX030436 *7 (Crim. Ct., Bronx 2019] [Ally, J.] [an unpublished decision provided to the Court by the petitioner which held that AML § 373(4) applied when the respondent was arrested at her apartment with animals inside the apartment]). Indeed, this decision and order expresses no opinion as to whether the search and seizure in this case would survive a Fourth Amendment analysis.
Therefore, this Court finds that the petitioner has met its burden of establishing that the dogs were properly seized under one of the mechanisms enumerated in AML § 373(1) — (5) by meeting the requirements of AML § 373(4).
Whether the Petitioner Established By a Preponderance of the Evidence That the Respondent Violated a Provision of Article 26The respondent argues that the petitioner has not established by a preponderance of the evidence that the respondent committed a violation of a provision of Article 26, because the environment the dogs were found in was not more unhealthy or unsanitary than many other apartments, and that the 311 video, admitted into evidence as Petitioner's Exhibit 1, should not be considered. However, even without the video, the Court finds that the petitioner has shown by a preponderance of the evidence that the respondent committed a violation of Article 26 of the AML.
Turning to the charges in the accusatory instrument, which are nine counts of failure to [*6]provide proper food and drink to impounded animal under AML § 356, the petitioner has established that the respondent committed this offense by a preponderance of the evidence. The Court need only find here that the petitioner has established by a preponderance of the evidence one charge under Article 26.
Pursuant to AML § 356, a person who, "having impounded or confined any animal, refuses or neglects to supply to such animal during its confinement a sufficient supply of good and wholesome air, food, shelter and water, is guilty of a misdemeanor " (AML § 356). This statute is violated if the person confining the animal fails to provide one of the four basic life necessities of wholesome air, food, shelter, and water (see People v Hock, 31 Misc 3d 896, 901-902 [Crim. Ct. Kings 2011] [All four basic requirements of life must be provided by Defendant to the confined animal for the obligations imposed by AML 356 to be met. If any one is missing, Defendant has failed to care for the animals under his confinement"]). Further, the statute is not limited to impounding organizations, but applies to owners as well (see People v Grant, 189 AD3d 1458 [2d Dept 2020]; People v McBride, 87 Misc 3d 1228[A] [Crim. Ct. NY County 2025]; People v Burgess, 86 Misc 3d 1238[A] [Crim Ct, NY County 2025]; People v Meadows, 57 Misc 3d 876 [Co. Ct., Ontario Co., 2017]; Hock, 31 Misc 3d 896; People v Linder, 156 Misc 2d 417 [Crim Ct, Richmond County 1992]).
Here, Officer Mercedes testified that he seized the nine dogs from the respondent's apartment. The respondent stated to him, "I would never hurt my puppies, they are my babies," identifying the nine dogs as his property, and in turn, as the individual confining the dogs. The next day, Dr. Niestat, qualified as an expert witness, examined each of the nine dogs. Based on her testimony concerning her examination of the dogs and observation of the respondent's apartment through video footage and photographs, this Court finds that the respondent did not provide at least some of the dogs with adequate food or shelter. As previously noted, three of the dogs were underweight, indicating that those three dogs were not receiving adequate food. Additionally, many of the dogs had dirty, stained haircoats from urine and feces, four dogs had pododermatitis, and two of the dogs had conjunctivitis (pink eye), all indicating that those dogs were living in an improper and unsanitary shelter.
The Court thus finds that the petitioner has met its burden of demonstrating by a preponderance of the evidence that the respondent violated Article 26 of the AML.

Whether the Requested Amount is Reasonable
Lastly, the respondent argues that the amount requested by the petitioner for the security bond, $47,428.34, is unreasonable. The petitioner argues that the amount is reasonable based upon the invoices admitted into evidence as Petitioner's Exhibit 4, which documents what care each of the 16 dogs received and the associated costs.
Upon review of the invoices, the costs attributed to each of the dogs were medically necessary — a majority of the charges pertained to medications and hospitalizations. However, the subject of the evidentiary hearing pertained to violations against the nine dogs that were seized, and there are no alleged violations regarding the seven puppies born while their mother was in the ASPCA's care. At this time, based on the circumstances of this case, the Court declines the request for the security bond for the puppies as they were not the subject of the criminal charges against the respondent. The seven puppies are also presently in foster care with their mother; thus, there are no boarding expenses attributed to them. Further, the respondent has [*7]not claimed ownership of the seven puppies.
Based on the invoices, the total cost of care for the seven puppies totaled $6,985. The Court subtracts this amount from the petitioner's request, resulting in a total of $40,444.34. Rounding down, the Court finds that the amount of $40,444 for the security bond is the reasonable amount.

CONCLUSION
Based on the foregoing, the petitioner met its burden under AML § 373(6).
The Court finds that the amount of $40,444 for the security bond is a reasonable amount. As such, the Court orders the respondent to post security in the amount of $40,444 within five (5) days of the issuance of this decision and order. It is further ordered that any failure to post security in this amount within five (5) days of the issuance of this decision and order shall result in the immediate forfeiture of the dogs to the ASPCA for disposition pursuant to the provisions of the AML.
This constitutes the decision and order of the Court.
Dated: February 19, 2026Bronx, New YorkHon. Joseph M. Sorrentino, J.C.C.